[No. C037493. Third Dist. Jan. 31, 2002.]

CALIFORNIA CORRECTIONAL SUPERVISORS ORGANIZATION, INC., Plaintiff and Appellant, v.
DEPARTMENT OF CORRECTIONS et al., Defendants and Respondents.

COUNSEL

Steven B. Bassoff for Plaintiff and Appellant.

Howard L. Schwartz, Linda A. Mayhew and Roy J. Chastain for Defendants and Respondents.

**OPINION**

**MORRISON, J.**—The California Correctional Supervisors Organization, Inc. (CCSO) sought a writ of mandate to compel the California Department of Corrections and its director (collectively CDC) to discontinue certain staffing practices which assertedly violated CDC's duty to provide employees with safe working conditions. The trial court issued a judgment denying the writ after concluding CCSO had not met its burden to prove any abuse of discretion by CDC. CCSO timely filed a notice of appeal. We affirm.

As the trial court judge explained at the hearing on the writ, CCSO's complaints are not trivial, but they cannot be resolved by the judiciary. CDC has broad discretion to determine adequate staffing levels at prisons and CCSO has not shown CDC has acted outside the bounds of reason. Therefore, the trial court properly denied the mandamus petition.

## STANDARD OF REVIEW

■ "A writ of mandate will lie to 'compel the performance of an act which the law specifically enjoins, as a duty resulting from an office, trust, or station' (Code Civ. Proc., § 1085) 'upon the verified petition of the party beneficially interested,' in cases 'where there is not a plain, speedy, and adequate remedy, in the ordinary course of law.' (Code Civ. Proc., § 1086.) The writ will issue against a county, city or other public body or against a public officer. [Citations.] However, the writ will not lie to control discretion conferred upon a public officer or agency. [Citations.] Two basic requirements are essential to the issuance of the writ: (1) A clear, present and usually ministerial duty upon the part of the respondent [citations]; and (2) a clear, present and beneficial right in the petitioner to the performance of that duty[.]" (*People ex rel. Younger v. County of El Dorado* (1971) 5 Cal.3d 480, 490-491 [96 Cal.Rptr. 553, 487 P.2d 1193], fn. omitted.)

Where a statute leaves room for discretion, a challenger must show the official acted arbitrarily, beyond the bounds of reason or in derogation of the applicable legal standards. (See *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287 [255 Cal.Rptr. 704].) Where only one choice can be a reasonable exercise of discretion, a court may compel an official to make that choice. (*Bank of Italy v. Johnson* (1926) 200 Cal. 1, 31 [251 P. 784]; *Ferrill v. Ellis* (1942) 50 Cal.App.2d 743, 746 [123 P.2d 857].)

■ "In reviewing the trial court's ruling on a writ of mandate (Code Civ. Proc., § 1085), the appellate court is ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial evidence. [Citation.] However, the appellate court may make its own determination when the case involves resolution of questions of law where the facts are undisputed." (*Saathoff v. City of San Diego* (1995) 35 Cal.App.4th 697, 700 [41 Cal.Rptr.2d 352].)

## BACKGROUND

The "Institutions" branch of CDC operates 33 prisons, among its other duties. These prisons vary widely in age, size, configuration, and type of inmate population. Each prison has its own warden who is responsible for operations, including employee safety. The prisons are organized into three regional districts and these in turn answer to CDC headquarters. Deputy Director David Tristan is in charge of institutions, and he answers to a directorate consisting of CDC Directors Clarence ("Cal") Terhune and Steve Lambra. Both Tristan and Terhune gave depositions in this case, described below.

Prison guards are organized in a paramilitary fashion. (See *Gray v. County of Tulare* (1995) 32 Cal.App.4th 1079, 1092 [38 Cal.Rptr.2d 317].) The first rank consists of correctional officers, who are represented by the California Correctional Peace Officers Association (CCPOA), not a party to this case. Next comes sergeants, and then lieutenants, who supervise correctional officers. These are largely represented by CCSO. Because they are supervisors, their labor group is subject to different laws than CCPOA. (See Gov. Code, § 3525 et seq.) A division of CCPOA also represents supervisors, but this is not relevant here.

The number of correctional officers, sergeants and lieutenants needed at a given prison varies depending on the watch, day of the week, inmate population and other factors, and the warden must ensure adequate staffing by considering these factors. Employees are entitled to vacations, sick leave, family leave and other time off, but their shifts must always be covered. Sometimes, to cover a vacant shift or for other reasons (riots, sweep searches, etc.), a warden authorizes overtime. Unfortunately, the use of overtime eats up the available pool of funding authorized by the Legislature and the Department of Finance. In order to bring a prison back into budget limits, a warden has to take steps to reduce employee expenses.

There are two somewhat similar techniques for reducing employee expenses discussed in this case. "Redirection" is the assignment of a supervisor to another task. For example, a training supervisor might be told to take charge of a prison wing for a given shift. "Cross-covering" is the assignment of multiple watches to a single supervisor. For example, a supervisor of building A might be told to supervise buildings A *and* B for a given shift.

As more money is available to a given prison, its need to redirect or cross-cover declines. Some prisons have more generous budgets for employee hours than others, and the cross-coverage and redirection policies vary widely.

Until 1998 no written or statewide standard governed these policies. On December 17, 1998, Tristan issued a directive to all wardens to prepare supervisor vacancy plans which did "not exceed the mandated 4.9 percent. Additionally, Wardens must ensure that there is an adequate amount of permanent full time supervisory staff assigned on all watches." The 4.9 percent was an average over a fiscal year and in effect meant that no less than 95 out of 100 theoretical supervisor slots would be filled or at least the dollar equivalent to those slots.

On February 29, 2000, Tristan issued another letter, directing wardens to consult with local CCSO chapters in drawing up redirection and cross-coverage plans. An amendment of March 10, 2000, directed wardens to

consult with CCPOA, as well, apparently in response to a "rift" the first letter had caused between the two labor groups.

These letters were in response to a labor action, as reported in the Sacramento Bee. (Furillo, *Prison supervisors protest double duty,* Sac. Bee (Jan. 28, 2000) p. A3.) Terhune and Tristan were questioned about this article and did not dispute salient parts, although the interpretations to be drawn from it were disputed. Terhune is quoted as saying he dislikes the practice, but " 'operationally, it's a fact of life and we have to do it.' " (*Ibid.*) A state audit reportedly revealed CDC had spent "$255 million in overtime from July 1997 to March 1999." (*Ibid.*) Because overtime was not budgeted, "[l]eaving supervisors' positions vacant makes up part of the difference. [¶] 'I don't like it, but it's a necessity of attempting to stay within your budget,' Terhune said." (*Ibid.*) The article claimed Terhune acknowledges cross-coverage created a safety problem. The article also stated: "Unlike the politically powerful [CCPOA], the CCSO does not have collective bargaining rights. [¶] By contract, [CDC] must fill all new rank-and-file vacancies. It can leave the supervisor slots open." (*Ibid.*)

Apparently the labor action did not result in any changes, and on April 25, 2000, CCSO filed the present action, seeking a writ of mandate to compel CDC to abide by statutes regarding workplace safety "and refrain from the use of the practice of 'redirection' or 'cross-covering' in the assignment of lieutenants and sergeants employed in state prisons" and "to refrain from assigning lieutenants and sergeants to more than one duty post at the same time."

Terhune testified in deposition his February 29, 2000 memo was in response to CCSO safety concerns. Its purpose was to ensure "a minimum number of supervisors at each institution in order to run safely." Where further reductions would be dangerous, other steps, such as reducing inmate programs, would have to be taken.

Sergeant Donald Fredericks, a CDC employee since 1973 and a CCPOA-elected supervisorial representative, testified the policies were dangerous. In his view, "any officer or supervisor that has ever been assaulted that was in a unit that was providing cross-coverage or redirection one way or the other is a direct result of that misdirected staffing." These practices broke the "security chain" of the prison. He did not testify to any specific incident.

On this evidence, the trial court denied the petition, concluding CCSO had not shown CDC abused its discretion regarding these staffing practices.

DISCUSSION

CCSO reasons as follows: Employers, like CDC, have a duty to provide a safe workplace (*Bendix Forest Products Corp. v. Division of Occupational Saf. & Health* (1979) 25 Cal.3d 465, 470-471 [158 Cal.Rptr. 882, 600 P.2d 1339]; *Bonner v. Workers' Comp. Appeals Bd.* (1990) 225 Cal.App.3d 1023, 1034-1035 [275 Cal.Rptr. 337]); cross-coverage and redirection impair employee safety; therefore, use of such practices is a breach of duty, or abuse of discretion, by CDC.

The trial court found CCSO had not met its burden to prove CDC breached its duty to its employees to provide a safe workplace. Viewing the evidence in favor of the judgment, cross-coverage and redirection are necessary functions of CDC, due to its budget constraints, and reasonable steps to ensure employee safety are taken when these practices are employed.

The statutes on which CCSO predicates its claim are Labor Code sections setting out general duties of employers regarding safety, as follows.

"Every employer shall furnish employment and a place of employment that is safe and healthful for the employees therein." (Lab. Code, § 6400, subd. (a).)

"Every employer shall furnish and use safety devices and safeguards, and shall adopt and use practices, means, methods, operations, and processes which are reasonably adequate to render such employment and place of employment safe and healthful. Every employer shall do every other thing reasonably necessary to protect the life, safety, and health of employees." (Lab. Code, § 6401.)

"No employer shall require, or permit any employee to go or be in any employment or place of employment which is not safe and healthful." (Lab. Code, § 6402.)

"No employer shall fail or neglect to do any of the following:

"(a) To provide and use safety devices and safeguards reasonably adequate to render the employment and place of employment safe.

"(b) To adopt and use methods and processes reasonably adequate to render the employment and place of employment safe.

"(c) To do every other thing reasonably necessary to protect the life, safety, and health of employees." (Lab. Code, § 6403.)

"No employer shall occupy or maintain any place of employment that is not safe and healthful." (Lab. Code, § 6404.)

██ These general statutes do not require an employer to take all conceivable steps to ensure safety, nor forbid an employer from adopting practices or methods which might conceivably result in harm to an employee. Particularly given the employment at issue herein, no guaranty of safety is possible. Room for discretion is required.

In a pair of cases involving the need to furnish safety equipment, we have emphasized that these statutes do not vest the judiciary with the power to act as an overseer of legislative and executive decisions about what is or is not reasonable safety in a given workplace.

In *California State Employees' Assn. v. Enomoto* (1981) 118 Cal.App.3d 599 [173 Cal.Rptr. 517], we reversed a judgment issuing a writ commanding that CDC issue its parole agents firearms as a necessary "safety device" under Labor Code section 6401. We concluded no substantial evidence supported the conclusion firearms were reasonably necessary. In part we observed that no parole agents had been killed and there were few documented altercation reports. In a critical passage we clarified: "We do not wish callously to hinge our decision on the auspicious record of no agent fatalities to date. To insist upon actual fatalities or injuries in large numbers before protective action is taken is folly. Yet we do not think a court should speculatively predict the likelihood of fatalities if the Department continues its current policy. Without contrary indications in the record, we defer to the experience and executive expertise of the Department on this issue. The question of deployment of deadly force is a 'delicate judgment . . . best exercised by the . . . legislative and executive officers' of the state and ordinarily 'can not and should not be accomplished by judicial fiat.' [*Long Beach Police Officers Assn. v. City of Long Beach* (1976) 61 Cal.App.3d 364, 371, 373 [132 Cal.Rptr. 348].] Department's management strongly adheres to the belief that the portage of firearms by parole agents would result in increased danger. [Director] Enomoto testified, '. . . when we arm agents as a general policy . . . despite training or quality of training or anything else, I am convinced that somebody is going to provoke situations where somebody is going to get hurt, somebody is going to get killed.' Deputy Director Arlene Becker was of the same opinion. Unsupported by hard facts to the contrary, judicial interference with agency discretion is unwarranted." (118 Cal.App.3d at pp. 603-604.)

In *California State Employees' Assn. v. Way* (1982) 135 Cal.App.3d 1059 [185 Cal.Rptr. 747], we affirmed a judgment upholding a California Youth

Authority (CYA) regulation forbidding employees (in particular, parole agents) to carry firearms on duty. The case arose on summary judgment and the record showed the evidence about the need for firearms by these employees was divided. The parole agents claimed Labor Code section 6401 required the CYA to provide firearms and therefore a regulation forbidding them was invalid. (135 Cal.App.3d at pp. 1062-1063.) A statute gave the CYA discretion to arm its parole agents. (*Id.* at pp. 1065-1066.) Although the parole agents had "substantial evidence" of the need for firearms, even on summary judgment that did not require reversal for a trial on the "reasonableness" of the regulation. (*Id.* at pp. 1066-1067.) Such evidence did not change the fact there was contrary evidence from which the CYA could, in its discretion, choose not to arm its parole agents.

In some cases, reasonable minds could not differ. (E.g., *Oakland Police Officers Association v. City of Oakland* (1973) 30 Cal.App.3d 96, 99-101 [106 Cal.Rptr. 134] [firearm necessary to police work].) But where reasonable minds can and do differ about a workplace safety issue, a discretionary call by the employer should not be disturbed. (*California State Employees' Assn. v. Way, supra,* 135 Cal.App.3d at p. 1066; accord, *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 97 [87 Cal.Rptr.2d 754] ["Judges do not decide where to build dams and levees, nor how high."].)

███ At best for CCSO the record shows it is possible in some cases a warden might make a mistake resulting in understaffing. But the policy limiting cross-coverage and redirection to a target ceiling, and requiring consideration of safety risks, is not beyond the fence which cabins a warden's discretion. (see *City of Sacramento v. Drew, supra,* 207 Cal.App.3d at p. 1297.)

In contesting this conclusion, CCSO departs from the appropriate standard of review. CCSO concedes the judgment denying the writ will be upheld if supported by substantial evidence. However, in derogation of that standard, CCSO recites the facts in the light most favorable to itself drawing inferences against the conclusion of the trial court. CCSO relies heavily on the deposition testimony of Sergeant Fredericks, and skews CDC Director Terhune's testimony. At bottom the trial court was faced with conflicting depositions. A factual contest based on written evidence is treated like other factual contests. (*Doak v. Bruson* (1907) 152 Cal. 17, 19 [91 P. 1001]; *People v. Western Meat Co.* (1910) 13 Cal.App. 539, 544 [110 P. 338].) The trial court was not required to credit Sergeant Fredericks's testimony. (*Hicks v. Reis* (1943) 21 Cal.2d 654, 659-660 [134 P.2d 788].) In fact, much of his evidence consisted of his opinion that cross-coverage was dangerous, but he

did not identify any dangerous outcomes resulting from the practice, which he conceded had been in place even before the 1998 letter to the wardens from Deputy Director Tristan. Further, the tenor of Director Terhune's testimony was not that the practice threatened safety, but the opposite: Wardens were to use cross-coverage and redirection when and only when it was safe. While Terhune could not state with certainty that the practice could not lead to a problem, he had "no evidence that indicates that it has an unreasonable effect, unreasonable or unacceptable effect."

Implicitly, CCSO invites this court to reweigh the evidence in the record, or view it in CCSO's favor, to conclude that Terhune's opinion about the safety of these staffing practices is wrong and CCSO's opinion is right. We decline to do so.

### DISPOSITION

The judgment is affirmed. CDC shall recover its costs on appeal.

Sims, Acting P. J., and Nicholson, J., concurred.