[No. C050065. Third Dist. July 31, 2006.]

DANIEL J. WIRTH et al., Plaintiffs and Appellants, v.
STATE OF CALIFORNIA et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III. of the Discussion.

**COUNSEL**

Lackie & Dammeier, Michael D. Lackie and Michael A. Morguess for Plaintiffs and Appellants.

K. William Curtis, Warren C. Stracener and Wendi L. Ross for Defendants and Respondents.

**OPINION**

**BUTZ, J.**—Plaintiffs Daniel J. Wirth and the California Correctional Supervisors Organization (collectively CCSO) filed a petition for writ of mandate seeking to compel defendants—the Governor, the State of California and the Department of Personnel Administration (DPA)—to afford salary

increases for state correctional supervisors in fiscal year 2003–2004, increases that plaintiffs claimed were mandated by Government Code sections 19849.18 and 19849.22.[1]

■ Section 19849.18 provides that supervisors of correctional officers shall receive "salary and benefits changes" that are "at least generally equivalent" to the changes granted to their rank-and-file subordinates. Section 19849.22 establishes the maintenance of a "supervisory compensation differential" as a legislative goal. CCSO, an employee organization representing supervisors in the Departments of Corrections and the California Youth Authority,[2] contends that DPA violated these statutes when it refused to grant correctional supervisors the same percentage salary raise as the officers they supervised, instead giving them a smaller raise supplemented by other compensatory benefits. The trial court denied the petition, concluding that DPA's actions were consistent with the legislative mandate.

■ We agree with the trial court that DPA's actions were not arbitrary, capricious or inconsistent with applicable law. We shall therefore affirm the judgment.

## FACTUAL BACKGROUND

Accepting CCSO's representation in its opening brief that "[t]here are no disputed facts in this case," we draw our summary of the facts primarily from the trial court's diligently researched and well-written decision.

In 1999, Assembly Bill No. 743 (1999–2000 Reg. Sess.) was enacted as section 19849.18. Supporters of the bill pointed out that the compensation of supervisors in certain departments was not keeping up with that of the employees they supervised. In some cases, the supervisors actually earned less than the rank-and-file employees they supervised. A promotion to supervisor could actually result in a lesser compensation package, creating recruitment and retention problems. The purpose of the bill was to halt the erosion of a compensation differential between nonunion supervisors and the rank-and-file employees of State Bargaining Units 5 (highway patrol officers), 6 (state correctional officers) and 8 (firefighters), whom they supervised.

Section 19849.18, which is at the heart of the present dispute, states: "Supervisors of state employees represented by State Bargaining Unit 5, 6, or 8 *shall receive salary and benefits changes that are at least generally*

---

[1] Undesignated statutory references are to the Government Code.

[2] Effective July 1, 2005, these entities are known as the Department of Corrections and Rehabilitation, Division of Adult Operations and Division of Juvenile Facilities. (Pen. Code, §§ 5000, 6001.)

*equivalent to the salary and benefits granted to employees they supervise.* For purposes of this section, 'salary' means base pay and shall not be construed to include such forms of compensation as overtime. The benefit package shall be the economic equivalent, but the benefits need not be identical. The determination of the specific benefits that supervisors of state employees represented by State Bargaining Unit 5, 6, or 8 shall receive shall be made through a meet and confer process as defined in Section 3533." (Stats. 1999, ch. 792, § 1, eff. Oct. 10, 1999, italics added.)

■ In 2000, Senate Bill No. 1910 (1999–2000 Reg. Sess.) was enacted as section 19849.22, creating a general policy of maintaining a compensation differential between supervisory peace officer/firefighters and those they supervise. This statute declares it the Legislature's policy to adequately compensate supervisors of these institutions. Subdivision (c) of section 19849.22 specifies that "[f]or purposes of measuring the compensation differential . . . , the value of salaries and other economic benefits shall be considered in calculating comparative rates." (Stats. 2000, ch. 902, § 1.)

In August 2003, as a result of negotiated collective bargaining agreements, DPA granted rank-and-file correctional officers of State Bargaining Unit 6 a 6.8 percent increase in general salary. DPA also granted these employees small increases in longevity and educational pay.

In the fiscal year 2003–2004, the state was facing a monumental budgetary crisis. The Department of Finance projected a $38.2 billion shortfall between revenue and expenditures. Consequently, the Governor directed DPA to achieve an $855 million reduction in employee compensation costs.

During 2003, DPA notified the representatives of excluded employees, including correctional supervisors that, due to the crisis, it would not be able to provide them with a general salary increase as of July 1, 2003, but would meet and confer with their representatives to discuss alternative forms of compensation. CCSO, however, took the position that correctional supervisors were automatically entitled to the same salary increases as rank-and-file officers.

In October 2003, DPA made a number of adjustments to correctional supervisors' compensation. It provided supervisors with a 6.8 percent increase in base salary effective October 1, 2003, and retroactive to July 1, for purposes of computing retirement benefits and other salary-driven differentials. Approximately 5 percent of the 6.8 percent total was in the form of an additional day of paid leave per pay period, as set forth in a mandatory personal leave program (PLP), wherein most excluded employees, including supervisors, received an additional day of personal leave in exchange for a

salary reduction. At the same time, however, the supervisors' retirement contribution was decreased by 5 percent, thereby increasing their total take-home pay.

In August 2004, DPA provided correctional supervisors a general salary increase of 7.5 percent, effective July 1. The PLP program was terminated and its value in cash restored to the supervisors' base pay. Rank-and-file correctional officers, on the other hand, received only a 5 percent increase for that period.

## PROCEDURAL HISTORY

On August 21, 2003, CCSO filed a petition for writ of mandate in the trial court,[3] alleging that DPA failed to perform its "legal and ministerial duties" under sections 19849.18 and 19849.22 by not according them the same percentage salary increases that rank-and-file officers received on July 1, 2003.[4]

After DPA's demurrer to the petition was overruled, the trial court requested that the parties submit further briefing and furnish the court with the legislative history of sections 19849.18 and 19849.22. Supplemental briefs were filed and the legislative history of the two statutes made part of the record.

On March 17, 2005, the court issued a written decision denying CCSO's petition. The court concluded that section 19849.18 did not require that correctional supervisors be given the exact same salary increases as their rank-and-file counterparts, but only required DPA to maintain an overall compensation differential between the two groups. Moreover, the statistical data and charts submitted by DPA for 2003 as well as the fiscal years before and after, persuaded the court that DPA had fulfilled its responsibility to maintain compensation differentials between supervisors and those whom they supervise, therefore fulfilling the overall purpose behind sections 19849.18 and 19849.22.

## DISCUSSION

### I. The Standard of Review

DPA contends that since salary setting is a legislative function, judicial review is limited to whether DPA's determination that it had fulfilled the

---

[3] The petition for writ of mandate was filed originally in San Bernardino County Superior Court. The case was transferred to Sacramento County on or about October 28, 2003.

[4] The petition also requested that the trial court compel DPA to meet and confer with CCSO over changes in benefits. That claim, however, was not pursued in the trial court and is not at issue here.

purpose of sections 19849.18 and 19849.22 was " ' "arbitrary, capricious, or entirely lacking in evidentiary support, or whether [it] has failed to follow [required] procedure[s]." ' " (*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29].)

CCSO, on the other hand, claims that the validity of DPA's actions turns strictly upon statutory interpretation, which appellate courts review de novo. The truth lies somewhere in between.

■ The setting of compensation for public employees is a legislative function (*Lowe v. California Resources Agency* (1991) 1 Cal.App.4th 1140, 1151 [2 Cal.Rptr.2d 558]; *Dominey v. Department of Personnel Administration* (1988) 205 Cal.App.3d 729, 738 & fn. 5 [252 Cal.Rptr. 620]) and one that, in the case of supervisory employees, the Legislature has delegated to DPA. (§ 19826, subd. (a); *Tirapelle v. Davis* (1993) 20 Cal.App.4th 1317, 1323, fn. 8 [26 Cal.Rptr.2d 666] (*Tirapelle*).)

■ Under Code of Civil Procedure section 1085, review of quasi-legislative actions " ' " 'is limited to an inquiry into whether the action was arbitrary, capricious or entirely lacking in evidentiary support, . . .' " . . . [and] [t]he petitioner has the burden of proof to show that the decision is unreasonable or invalid as a matter of law.' " (*City of Arcadia v. State Water Resources Control Bd.* (2006) 135 Cal.App.4th 1392, 1409 [38 Cal.Rptr.3d 373], quoting *Citizens for Improved Sorrento Access, Inc. v. City of San Diego* (2004) 118 Cal.App.4th 808, 814 [13 Cal.Rptr.3d 259].)

■ The "arbitrary, capricious or unsupported by evidence" standard applies to a review of the substantive merit of an administrative agency's quasi-legislative act—that is, whether the agency " 'reasonably interpreted the legislative mandate.' " (*Credit Ins. Gen. Agents Assn. v. Payne* (1976) 16 Cal.3d 651, 657 [128 Cal.Rptr. 881, 547 P.2d 993].) *If* the agency's action depends solely upon the correct interpretation of a statute, that is a question of law upon which the court exercises its independent judgment. (*Lewin v. St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 386–387 [146 Cal.Rptr. 892].) In doing so, however, we are guided by the principle that an " 'administrative [agency's] interpretation [of controlling statutes] . . . will be accorded great respect by the courts and will be followed if not clearly erroneous.' " (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 [78 Cal.Rptr.2d 1, 960 P.2d 1031]; see also *Spanish Speaking Citizens' Foundation, Inc. v. Low* (2000) 85 Cal.App.4th 1179, 1214 [103 Cal.Rptr.2d 75] ["While the ' "final responsibility for the interpretation of the law rests with the courts" ' [citation], 'the construction of a statute by officials charged with its administration . . . is entitled to great weight' "].)

## II. Interpretation of the Compensation Differential Statutes

CCSO claims that compliance with the language and the purpose of sections 19849.18 and 19849.22 can only be achieved by granting correctional supervisors the same salary increases (without regard to benefits) as their subordinates. Section 19849.18, it will be recalled, provides that such supervisors shall receive "salary and benefits changes that are at least generally equivalent" to those granted rank-and-file employees. The section goes on to define "salary" as "base pay" but not forms of compensation such as overtime, and requires that specific benefits of supervisors be determined through the "meet and confer process." (See § 3533.) Section 19849.22 declares an overall policy of maintaining a compensation differential.

According to CCSO, section 19849.18 clearly and unambiguously requires that supervisors receive two types of increases: salary increases and benefits increases. They claim that because DPA did not grant them the same 6.8 percent across-the-board salary increase that their rank-and-file counterparts received, it failed to comply with the statutory mandate.

■ In analyzing what the Legislature meant in enacting a given statute, our first step is to examine the statute's words because they are generally the most reliable indicator of intent. (*People v. Gardeley* (1996) 14 Cal.4th 605, 621 [59 Cal.Rptr.2d 356, 927 P.2d 713].) "If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) On the other hand, if the language is ambiguous, "courts may employ a variety of extrinsic construction aids, including legislative history, and will adopt the construction that best harmonizes the statute both internally and with related statutes." (*Summers v. Newman* (1999) 20 Cal.4th 1021, 1026 [86 Cal.Rptr.2d 303, 978 P.2d 1225].)

Turning first to the wording of section 19849.18, we find no clear, unambiguous language that would require DPA to grant salary increases to supervisory employees in lockstep with those granted to rank-and-file officers. The statute requires "*salary and benefits changes*" that "are at least *generally* equivalent to the salary and benefits" of the employees they supervise. (Italics added.) Section 19849.18 does not clearly direct that salary changes and benefits changes be treated by DPA as separate items. Instead, by referring to "salary and benefits changes" section 19849.18 appears to treat both as a package, and to grant DPA *discretion* to approximate that package, as illustrated by the qualifying phrase "at least generally." Nonetheless, we do not believe the language is entirely free from ambiguity. Therefore, we shall

consider other applicable statutory provisions as well as legislative history, where appropriate, to ascertain whether CCSO's interpretation is plausible.

█ We note at the outset that "[a]n individual statute must be construed in the context of the comprehensive statutory scheme of which it is a part. Statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. Where uncertainty exists, appellate courts must construe provisions in a reasonable, common sense fashion taking into consideration the practical consequences that will flow from a particular interpretation." (*Berkeley Center for Independent Living v. Coyle* (1996) 42 Cal.App.4th 874, 878 [50 Cal.Rptr.2d 39]; accord, *Long Beach Police Officers Assn. v. City of Long Beach* (1988) 46 Cal.3d 736, 746 [250 Cal.Rptr. 869, 759 P.2d 504]; *San Francisco Internat. Yachting etc. Group v. City and County of San Francisco* (1992) 9 Cal.App.4th 672, 680 [12 Cal.Rptr.2d 25].)

█ In 1981, the Legislature delegated the function of salary setting for nonmerit employees to DPA. (§ 19815.2; *Tirapelle, supra,* 20 Cal.App.4th at p. 1322 & fn. 8.) This grant of authority, however, came with a significant caveat, i.e., section 19826, subdivision (a), also enacted in 1981, which declares that DPA "shall make *no adjustments that require expenditures in excess of existing appropriations that may be used for salary increase purposes.*" (Italics added.)

█ When the Legislature enacts legislation, it is presumed to be aware of its prior enactments. (*Golden Day Schools, Inc. v. Department of Education* (1999) 69 Cal.App.4th 681, 691 [81 Cal.Rptr.2d 758]; *County of Tulare v. Campbell* (1996) 50 Cal.App.4th 847, 853 [57 Cal.Rptr.2d 902].) In this era of perennial budget deficits, we find it extremely unlikely that section 19849.18, enacted in 1999, would have been intended by the Legislature to trigger automatic salary increases without corresponding budget appropriations earmarked for that purpose. To indulge in such an interpretation would require that we infer that the Legislature intended section 19849.18 to repeal section 19826, subdivision (a) by implication. █ We may not do so without a declaration by the Legislature to that effect. (*Golden Day Schools,* at p. 691.) Instead, " '[t]he presumption is . . . "against repeal by implication where express terms are not used and the statutes are not irreconcilable." ' " (*Ibid.,* quoting *County of Tulare, supra,* 50 Cal.App.4th at p. 853.) Thus, the only reasonable method of harmonizing the two statutes is to construe the term "salary and benefits changes" as an entire package, affording DPA sufficient flexibility to maintain compensation differentials in times of penury as well as prosperity.

Our conclusion is not altered by the later enactment of section 19849.22, declaring it legislative policy to maintain a compensation differential between

supervisors and the employees they supervise.[5] Indeed, our interpretation is compatible with and supported by subdivision (c) of section 19849.22, which states that in measuring compensation differential, "the value of *salaries and other economic benefits* shall be considered in calculating comparative rates." (Italics added.)

Legislative history also supports the trial court's finding that the Legislature, in calling for "generally equivalent" compensation changes between the two employee groups, did not intend to strip the DPA of all traditional discretion in fixing the salaries of supervisors and other excluded employees.

In its original form, Assembly Bill No. 743 (1999–2000 Reg. Sess.) required that supervisors be granted "the economic equivalent" of salary and benefits changes accorded to their supervisees, and appropriated "an unspecified sum from the General Fund to the Controller to fund the salary and benefit changes authorized by these provisions." (Legis. Counsel's Dig., Assem. Bill No. 743 (1999–2000 Reg. Sess.) as introduced Feb. 24, 1999].)[6] An appropriation of $32.6 million was subsequently inserted to implement the legislation. (Assem. Amend. to Assem. Bill No. 743 (1999–2000 Reg. Sess.) May 28, 1999.) Eventually, the bill was amended to delete any fiscal appropriation, and the phrase "*at least generally*" inserted to modify the term "equivalent." (Sen. Amend. to Assem. Bill No. 743 (1999–2000 Reg. Sess.) Sept. 8, 1999.)

In a letter supporting Assembly Bill No. 743 (1999–2000 Reg. Sess.), the California Correctional Peace Officers Association (CCPOA) assured the Governor that it did not "require any additional expenditure of funds than the state decides it can reasonably afford." (Jeff Thompson, Chief of Gov. Relations, CCPOA, letter to Governor Gray Davis, Sept. 22, 1999, p. 2.) An enrolled bill memorandum to the Governor, dated September 24, 1999, noted that "[c]urrent law prevents [DPA] from setting

---

[5] The full text of section 19849.22, which was enacted in 2000 and amended in 2001, provides:

"The Legislature finds and declares the following:

"(a) If the state is to attract and retain a competent correction workforce, there is a compelling need to adequately compensate state peace officer/firefighter members who are supervisors.

"(b) A supervisory compensation differential is necessary to compensate state peace officer/firefighter members who are supervisors within the departments and boards of the Youth and Adult Correctional Agency or who are correctional supervisors within the State Department of Mental Health for the greater responsibility of accomplishing correctional work through the direction of others.

"(c) For purposes of measuring the compensation differential referred to in subdivision (b), the value of salaries and other economic benefits shall be considered in calculating comparative rates."

[6] A 104-page exhibit containing the legislative history of Assembly Bill No. 743 (1999–2000 Reg. Sess.) was prepared by the Legislative Intent Service and was submitted to and considered by the trial court.

salaries in excess of existing appropriations. Therefore, *this bill has no fiscal impact* according to the DPA." (Enrolled Bill Mem. to Governor, Assem. Bill No. 743 (1999–2000 Reg. Sess.) Sept. 24, 1999, p. 1.) Supporters of the bill also represented that the bill "does not jeopardize DPA's salary setting authority, or cause the expenditure of salary funds outside of an appropriation." (*Ibid.*)

▮▮▮ Manifestly, the bill was watered down from its original form so that it did not interfere with DPA's traditional discretion in setting salaries, or require that salaries be increased without legislative appropriation. We therefore agree with the trial court's ruling that section 19849.18 "was enacted, not for the purpose of attaining exactitude or identity between the salary and benefits of supervisors and the salary and benefits of the employees they supervise, but for the purpose of avoiding compaction between supervisors' and subordinates' salary levels and maintaining a differential between those salary levels sufficient to recruit and retain supervisors."

Because DPA is forbidden by statute from increasing salaries without a legislative appropriation, it must necessarily navigate between implementing lofty legislative policy goals and not committing the state to spending money that it does not have. We find it unreasonable to suggest that, in times of fiscal crisis like the one that visited upon the state in 2003–2004, the Legislature intended either of the compensation differential statutes to prohibit DPA from fashioning a benefits and salary package rather than uniform increases, for the purpose of maintaining a compensation differential in favor of supervisors.

CCSO also claims that because section 19849.18 requires DPA to meet and confer with supervisory employees' representatives with respect to "specific benefits" but not salaries, the Legislature must necessarily have viewed salary and benefits as separate classes of compensation that must be adjusted independently. We disagree.

It is not inconsistent for the Legislature to have made specific benefits changes subject to the meet and confer process without necessarily mandating simultaneous salary increases that are automatic and untouchable. Under the Bill of Rights for State Excluded Employees (§ 3525 et seq.), supervisory employees who are otherwise excepted from coverage under the Ralph C. Dills Act (§ 3524 [formerly known as the State Employer-Employee Relations Act (§ 3512 et seq.)]), may form organizations to represent them in their relations with the state (§ 3530). Upon request, the state must "meet and confer" with these organizations, which means simply that it must " 'consider as fully as the employer deems reasonable' " the presentations that are made by these organizations on behalf of its supervisory members, prior to arriving at a determination of policy or course of action. (*Tirapelle, supra,* 20 Cal.App.4th at p. 1327, fn. 14, quoting § 3533.) Because section 19849.18

does not require that benefits changes be identical but only "generally equivalent," it is not surprising that the Legislature would afford the supervisors' representatives an opportunity to present their views regarding specific benefits changes, before DPA finally determines a course of action. Salary increases on the other hand, being more dependent on appropriation by the Legislature, would not be as productive a subject of the "meet and confer" process.

CCSO contends that the trial court's interpretation would produce absurd results because it would allow DPA to set a 0 percent salary increase for supervisors every year, shifting all compensatory increases onto the benefits side of the ledger. Such a course of action, CCSO suggests, would make a mockery of the statute's directive that *"salary and* benefits changes" be generally equivalent for both classes of employees.

 But this case does not call upon us to determine whether, under the exaggerated hypothetical posed by CCSO, DPA's quasi-legislative actions might be characterized as arbitrary and capricious, or would amount to a failure to exercise its quasi-legislative authority within the bounds of its statutory mandate. (See *Morris v. Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697].) To prevail on its petition for writ of mandate, CCSO had to demonstrate that DPA "has failed to perform an act despite a clear, present and ministerial duty to do so," and that the supervisory employees had "a clear, present and beneficial right to that performance." (*Riverside Sheriff's Assn. v. County of Riverside* (2003) 106 Cal.App.4th 1285, 1289 [131 Cal.Rptr.2d 454]; see Code Civ. Proc., § 1085.) "Where a statute leaves room for discretion, a challenger [in an ordinary mandamus action] must show the official acted arbitrarily, beyond the bounds of reason or in derogation of the applicable legal standards." (*California Correctional Supervisors Organization, Inc. v. Department of Corrections* (2002) 96 Cal.App.4th 824, 827 [117 Cal.Rptr.2d 595].)

The trial court concluded that, in a period of budgetary austerity, the compensation differential statutes left DPA room for discretion not to match salary increases dollar for dollar, but instead to combine salary increases with other benefits in meeting the statutory objective. Because we concur in that conclusion, we are compelled to affirm the judgment denying the petition for writ of mandate.

### III. "Generally Equivalent" Increases*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 131.

## DISPOSITION

The judgment denying the petition for writ of mandate is affirmed. Defendants shall recover their costs on appeal. (Cal. Rules of Court, rule 27(a)(2).)

Nicholson, Acting P. J., and Raye, J., concurred.