[No. A120667. First Dist., Div. Four. July 30, 2009.]

COACHELLA VALLEY UNIFIED SCHOOL DISTRICT et al., Plaintiffs and Appellants, v.
STATE OF CALIFORNIA et al., Defendants and Respondents.

Counsel

Hadsell, Stormer, Keeny, Richardson & Renick, Dan Stormer, Virginia Keeny; Law Offices of Marc Coleman, Marc Coleman; Garcia, Calderon & Ruiz and Mary Hernandez for Plaintiffs and Appellants.

California Rural Legal Assistance, Inc., and Cynthia L. Rice for Adelaida Gutierrez as Amicus Curiae on behalf of Plaintiffs and Appellants.

Baute & Tidus, Sean A. Andrade; Roberta Fesler and John F. Walsh for Los Angeles Unified School District as Amicus Curiae on behalf of Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, Douglas M. Press, Assistant Attorney General, Karin S. Schwartz, Susan M. Carson and Jennifer A. Bunshoft, Deputy Attorneys General, for Defendants and Respondents.

Opinion

**REARDON, J.**—California participates in the federal No Child Left Behind Act of 2001 (NCLBA) (20 U.S.C. § 6301 et seq.) and includes in its assessment program for purposes of NCLBA accountability most of the nearly 1.6 million students attending public schools in this state who are classified as "limited English proficient" or "English learners."[1] California tests *all* its students in English, although school districts are obliged to provide limited English proficient (LEP) students certain accommodations or testing variations if the same are regularly used in the classroom or for assessment. Appellants—nine school districts[2] receiving funds under the NCLBA—are seeking a writ of mandate requiring respondents to abide by

---

[1] While the NCLBA classifies students whose native language is not English as " 'limited English proficient,' " California statutes refer to these same students as " 'English learner[s].' " (See 20 U.S.C. § 7801(25); Ed. Code, § 306, subd. (a).) The parties agree that the terms are synonymous.

[2] Appellant school districts are Coachella Valley Unified School District; Chula Vista Elementary School District; Alisal Union Elementary School District; Terra Bella Union Elementary School District; Pajaro Valley Unified School District; Oxnard Elementary School District; Sweetwater Union High School District; Salinas Union High School District; and San Ysidro School District (collectively, School Districts). Three organizations and two students were also party plaintiffs. Only one student remains in the lawsuit. The organizations and the student have not appealed the judgment as they contend some of their claims remain to be adjudicated. Respondents are the State of California (California or State); Arnold Schwarzenegger, as Governor; the State Board of Education (State Board), and its members; the State Department of Education (CDE); and Jack O'Connell, as Superintendent of Public Instruction.

the law's requisites for assessing LEP students. They are certain that the NCLBA sets forth ministerial duties capable of enforcement by a writ of mandate, and respondents did not observe these duties. Specifically, they claim that because California tests LEP students in English for purposes of NCLBA accountability, the tests are not "valid and reliable" for these students as required by the federal legislation. Additionally, the School Districts argue that the trial court was wrong in deciding as a matter of law that the LEP assessment program which the State Board adopted did not constitute an abuse of discretion.

As we explain, the School Districts' premise that the purpose of California's LEP testing regime is at odds and incompatible on its face with the NCLBA is incorrect. Moreover, the federal law affords participating states considerable discretion in fashioning an assessment program for their LEP students. To this end, the State Board exercised its quasi-legislative powers in adopting the testing policy and program that it did. Our standard for reviewing this action is exceedingly deferential, as contrasted with the independent judgment standard which the School Districts hope we will employ. Finally, we are convinced that the State Board did not abuse its discretion as a matter of law in rendering these key policy decisions, and accordingly affirm the judgment.

## I. FACTUAL BACKGROUND

### A. *NCLBA Framework*

#### 1. *Overview*

Signed into law in January 2002, the NCLBA significantly amended the Elementary and Secondary Education Act of 1965,[3] which historically provided federal educational grants to the states under its title I provisions. The NCLBA continues as a federal funding statute with the overarching purpose of ensuring "that all children have a fair, equal, and significant opportunity to obtain a high-quality education and reach, at a minimum, proficiency on challenging State academic achievement standards and state academic assessments." (20 U.S.C. § 6301, fn. omitted.) Academic accountability is the cornerstone of the act, as it strives to ensure that "high-quality academic

---

[3] Congress originally enacted this act as Public Law No. 89-10 (Apr. 11, 1965) 79 Statutes 27. Due to the extensive revisions of NCLBA legislation, title I and other provisions of the Elementary and Secondary Education Act of 1965 have been codified as amended by the NCLBA at 20 United States Code section 6301 et seq.

assessments, accountability systems, teacher preparation and training, curriculum, and instructional materials are aligned with challenging State academic standards so that students, teachers, parents, and administrators can measure progress against common expectations for student academic achievement." (*Id.*, § 6301(1); see *Connecticut v. Spellings* (D.Conn. 2006) 453 F.Supp.2d 459, 468–469.)

Congress enacted the NCLBA pursuant to its spending powers. (U.S. Const., art. I, § 8, cl. 1.) Incident to the spending power, "Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.' [Citations.]" (*South Dakota v. Dole* (1987) 483 U.S. 203, 206 [97 L.Ed.2d 171, 107 S.Ct. 2793], quoted in *Connecticut v. Spellings, supra*, 453 F.Supp.2d at p. 469.) States choosing to participate in the NCLBA thus must adopt challenging academic content standards that apply to all students, and create and implement a statewide accountability system for ensuring that schools make "adequate yearly progress." (20 U.S.C. § 6311(b)(1)(A), (B), (2)(A).) The engine measuring this progress is the set of standards-based tests aligned to those content standards and administered to students on a yearly basis. (*Id.*, § 6311(b)(3)(A), (C)(ii).)

To be considered for funding, the state educational agency must package these standards, accountability system and assessment measures into a plan that it submits to the Secretary of Education (Secretary). (20 U.S.C. § 6311(a)(1).) The plans in turn are subject to a peer review process and require the Secretary's approval. (*Id.*, § 6311(e)(1)(A), (C).) The Secretary has 120 days from submission of a plan to determine, with the assistance of the peer review process, if the plan meets the requirements of the statute. (*Ibid.*) Once approved, a state plan remains in effect for the duration of the state's participation in the NCLBA program. (20 U.S.C. § 6311(f)(1)(A).) However, states may revise their plans to reflect changes in strategies and programs, with all significant changes submitted to the Secretary. (*Id.*, § 6311(f)(2).)

### 2. *Annual Testing Requirements*

The NCLBA requires participating states to conduct annual testing of students in each of grades three through eight, and at least once for grades 10 through 12, in mathematics and reading or language arts.[4] (20 U.S.C.

---

[4] Proficiency of students in science must be assessed no less than one time during grades three through five, six through nine, and 10 through 12. (20 U.S.C. § 6311(b)(3)(C)(v)(II).)

§ 6311(b)(3)(C)(v)(I), (vii).) *All* students are to be included in the annual assessment program, including LEP students. (*Id.,* § 6311(b)(3)(C)(ix)(III).) These are students whose native language is not English and "whose difficulties in speaking, reading, writing, or understanding the English language may be sufficient to deny the individual—[¶] (i) the ability to meet the State's proficient level of achievement [under the NCLBA] . . . ." (20 U.S.C. § 7801(25)(C)(i), (D)(i).)

LEP students "shall be assessed in a valid and reliable manner and provided reasonable accommodations on assessments . . . , including, to the extent practicable, assessments in the language and form most likely to yield accurate data on what such students know and can do in academic content areas, until such students have achieved English language proficiency . . . ." (20 U.S.C. § 6311(b)(3)(C)(ix)(III).) The United States Department of Education's (USDE) March 2003 "Standards and Assessments Non-Regulatory Guidance" clarifies that accommodations for LEP students may include extra time, native language assessments, administration to a small group, flexible scheduling, simplified instruction, use of dictionaries, and giving instructions in the native language. Further, the guide provides: "To the extent practicable, States must make every effort to develop and administer native language assessments, if doing so is likely to yield the most accurate and reliable information about what those students know and can do. If the administration of native language assessments is not practicable, for example, when only a small percentage of limited-English students in the State speak a particular language, States must offer students of limited English proficiency other appropriate accommodations in order to yield accurate and reliable information on what those students know and can do in subjects other than English."

Once a student has attended school in the United States for three consecutive years, the statute calls for assessment of reading or language arts using tests written in English, unless, on a case-by-case basis, the local school district decides to extend native language testing for another two years. (20 U.S.C. § 6311(b)(3)(C)(x).) Additionally, a state may, for one year, exempt from the NCLBA reading and language arts testing requirement those LEP students who have attended schools in the United States for less than 12 months. (34 C.F.R. § 200.6(b)(4) (2009).)

Consistent with the goal of including all LEP students in a statewide assessment regime, the NCLBA calls for each state to "identify the languages other than English" that are spoken in the various student populations "and indicate the languages for which yearly student academic assessments are not available and are needed." (20 U.S.C. § 6311(b)(6).) States must make "every

effort" to develop these assessments and may request assistance from the Secretary if such assessments are needed. However, the Secretary cannot mandate a specific assessment or mode of instruction. (*Ibid.*)

The NCLBA also attends to the *quality* of state assessments. States may select the assessment to measure proficiency, but all assessments must be aligned with the state's academic standards and must be "consistent with relevant, nationally recognized professional and technical standards." (20 U.S.C. § 6311(b)(3)(C)(ii), (iii).)

### 3. *Adequate Yearly Progress*

The NCLBA umbrella of reforms aims above all to improve student achievement, increase accountability of educational providers and close the achievement gaps between different student populations. (20 U.S.C. § 6301(1)–(3).) Accordingly, participating states and schools must annually report the results of student assessments measured against statistically valid and reliable benchmarks. (*Id.*, §§ 6301, 6311(b)(2)(B)–(C), (h).) The directive for "adequate yearly progress" requires states to develop "separate measurable annual objectives for continuous and substantial improvement" for all students and for the following subsets: LEP students, economically disadvantaged students, students from racial and ethnic groups and students with disabilities. (*Id.*, § 6311(b)(2)(C)(v).)

As a general matter, a school fails to make adequate yearly progress if any identified group of students at any grade level fails to attain proficiency in the state's academic achievement standards. (20 U.S.C. § 6311(b)(2)(I)(i).) However, if the percentage of students in a particular group that has not attained proficiency *decreases* by 10 percent from the preceding year and certain other conditions are met, the school will still be deemed to have made adequate yearly progress. (*Ibid.*) The NCLBA requires a governing school district to identify for "school improvement" those schools that do not make adequate yearly progress for two consecutive years, and if such failure continues, the act calls into play the progressively severe consequences of corrective action and restructuring. (20 U.S.C. § 6316(b)(1)–(4) [school improvement], (7) [corrective action], (8) [restructuring].)

Similarly, the NCLBA requires the state to identify for improvement any local school district that fails to make adequate yearly progress and to take corrective action in the face of continued failure. (20 U.S.C. § 6316(c)(3)–(9)

[improvement], (10) [corrective action].) Corrective actions for local school districts include deferred programmatic funding or reduced administrative funding; requiring a new curriculum; replacement of district personnel; removing certain schools from the jurisdiction of the district; appointing a receiver; abolishing or restructuring the district; and authorizing students to transfer to schools in other districts. (*Id.*, § 6316(c)(10)(C).)

## B. California's Framework of Pertinent Education Laws

### 1. Proposition 227

In 1998, California voters enacted Proposition 227, the "English Language in Public Schools" initiative codified at Education Code section 300 et seq. This legislation declares that "all children in California public schools shall be taught English as rapidly and effectively as possible." (Ed. Code, § 300, subd. (f).) Under this new imperative, all public school students are to be "taught English by being taught in English," subject to the right of parents to seek a waiver from this requirement. (*Id.*, § 305.)

### 2. Testing and Assessment Laws

Prior to passage of the NCLBA, the California Legislature established the Standardized Testing and Reporting (STAR) Program and enacted the Public Schools Accountability Act of 1999, as well as legislation calling for development of a high school exit examination. (Stats. 1997, ch. 828, § 11 [see current Ed. Code, § 60640 et seq.; STAR Program]; Ed. Code, §§ 52050 et seq. [Public Schools Accountability Act], 60850, 60851 [high school exit exam].) The present STAR Program uses an assessment instrument known as the California Standards Tests (CST) to measure how well students are achieving the state's content and performance standards in grades two through 11. (*Id.*, § 60642.5, subd. (a).) The CST is only administered in English. In turn the high school exit exam measures the skills and knowledge students must demonstrate in English in order to earn a high school diploma; by statute it is administered in English. (*Id.*, § 60852.) Successful passage of the high school exit exam debuted as a condition of high school graduation commencing with the 2003–2004 school year. (*Id.*, § 60851, subd. (a).)

In order to measure the academic achievement of students, schools and districts *over time*, the Public Schools Accountability Act provides for an Academic Performance Index (Ed. Code, § 52052) consisting of a variety of

indicators including the results of achievement tests, attendance rates, and graduation rates (*id.*, § 52052, subd. (a)(4)). Together, the Academic Performance Index, the CST and the high school exit exam form the lynchpin of California's statewide system of academic assessments and accountability.

Educational Testing Service (ETS) has been the test contractor for both the CST and the high school exit exam. ETS management has indicated that the service works closely with the State Board and CDE on testing issues relating to English learners.

In developing the CST and high school exit exam for California, ETS staff was aware of and incorporated principles of "universal design" theory. As explained in an internal ETS report, whereas most tests currently are designed "in ways that limit the means of recognition, expression and engagement available to students," the tenets of universal design assert that "the means available to a student within a learning environment should be available within an assessment environment." Thus, as an example pertaining to test development, universal design tenets would encourage elimination of unnecessary linguistic complexity.

ETS test development staff employ a number of procedures designed to reduce any avoidable disadvantages to English language learners. Test items are subject to multiple reviews for clarity of phrasing as well as bias and sensitivity, and in order to reduce inappropriate linguistic complexity and linguistic bias. These efforts include reducing excessive wordiness and the length of sentences and paragraphs; avoiding unusual words, multiple-meaning words and irregularly spelled words; avoiding the use of several names for the same concept; and using typeface and graphic strategies to signal the relative importance of information.

ETS instructs its test developers to generally avoid unnecessarily difficult language and "[to use] the simplest and most straightforward language consistent with valid measurement to help avoid construct-irrelevant difficulty for test takers who are not native speakers of English . . . ." ETS standards call for the test development teams to reduce threats to validity that might arise from language differences. The service also trains the assessment review panels to recognize and comment on unnecessary linguistic complexity, and to ensure that items are fair for English learners. Following each test administration, all test items are evaluated for item quality and possible bias against or unfairness to English learners and others.

C. *State Board Submits California Plan to the USDE*

In June 2002, the State Board submitted California's state plan for NCLBA funding to the USDE.[5] We take judicial notice that the Secretary approved the plan in July 2002. California has received NCLBA funds since the 2002–2003 school year.

With the plan the State Board designated the CST and the high school exit exam as the assessments California schools would administer to satisfy NCLBA accountability and assessment obligations. The plan related that these tests are administered in English; accommodations for English learners are available on the CST; and during the next six to 12 months the State Board would be evaluating the accommodation policies for each test to maximize accessibility for English learners. As permitted, California does not include in adequate yearly progress calculations the scores on English language arts tests of recently arrived LEP students in their first year of school in the United States.

D. *The State Board Decides to Promulgate Regulations on Testing Accommodations for English Learners Instead of Developing Primary Language Tests*

In September 2002, the State's Expert Panel on Assessment (Expert Panel or panel) convened for two days to discuss development of a comprehensive, consistent testing policy for including English learners in our statewide assessment programs. Also attending these meetings were the State Board president and the board member assigned as the liaison on testing and NCLBA accountability issues.[6] The panel considered two main options: create STAR primary language tests; or revise the State's accommodations policy for English learners. The panel reviewed testing policies in other states with significant English learner student populations. Members were mindful that the policy environment in California was different in that Proposition 227 pronounces the public policy to promote the rapid development of English for English language learners. Thus, primary language testing could send conflicting signals throughout the education system.

---

[5] The State Board is the state educational agency designated to carry out the purposes and provisions of the NCLBA, vested with authority to prepare and submit the state plan and any amendment thereto. (Ed. Code, § 12032; 20 U.S.C. § 6311(b)(3)(A).)

[6] The Legislature has established an NCLBA liaison team to advise the superintendent and State Board on all appropriate matters concerning implementation of the NCLBA. Two members appointed by the State Board are to sit on the team. (Ed. Code, § 52058.1, subds. (a), (b)(3).)

The panel also took into account the fact that English learner students exhibit a wide range of academic skills in their native language. As one of the members who was asked to report on the meeting explained, English learners may speak in their native language, but not all can read or write in it and thus their native language literacy may or may not exceed their English literacy. The panel reasoned that while testing students who have significant academic skills in their native language could improve the accuracy of those students' test scores, testing students with few academic skills in their native language could reduce test accuracy. The panel concluded that since approximately 90 percent of English learners are instructed in English, native language tests would not improve the accuracy of the State's tests.

Further, the Expert Panel was cognizant that while more than 80 percent of English language learners speak Spanish, there are at least 40 different languages represented in the statewide student population. Panel members concluded there was no rationale for excluding certain languages from a primary language testing policy, and it would not be feasible to develop primary language tests in so many languages. There was also recognition that English language arts skills cannot be measured in another language. Finally, there were significant concerns about the comparability of tests under a parallel system of tests. Parallel tests in other languages presented administrative and psychometric challenges. For example, a translated question may not have the same meaning as the English question, or may have different psychometric properties. And, although a reading test could be developed in other languages, such a test would not be strictly comparable to the assessment of English language arts under existing state tests. For these reasons, the panel rejected the notion that translated tests could ever be comparable.

Based on the above rationale, the Expert Panel advised against primary language testing in California. To guide development of a policy of accommodations that could improve testing conditions for English learners, the panel cautioned that the intent of test accommodations is to level the playing field. Thus accommodations should reduce the impact of language, where appropriate, but should not give English language learners an unfair advantage over nonaccommodated students. Additionally, the impact of each accommodation should be evaluated to ascertain if it (1) would lead to a more accurate description of student achievement and improvement; (2) could be implemented consistently; and (3) would produce valid test results and provide useful information to parents and teachers.

For the State Board's October 2002 meeting, board members received a report on the Expert Panel's meeting, recommendations and advice, along with the CDE's recommendation that the State Board approve regulations addressing allowable accommodations for English learners. The matter of

testing policies for English learners was set as an informational agenda item for that meeting and the deputy superintendent delivered his report at that time. The State Board president and the board members serving as testing and NCLBA liaison each declared that after considerable discussion, the State Board ultimately decided against testing English language learners in their primary language for state and NCLBA accountability purposes. It was the consensus that primary language testing for the statewide accountability system under the NCLBA would be inconsistent with California's goals, particularly in view of Proposition 227.

Instead, the State Board made the decision to push forward with developing and implementing regulations that would authorize accommodations for English learners, the option the Expert Panel recommended as the overarching policy for including English learners in California's statewide assessment program. At its December 2002 meeting, the State Board extensively discussed specific accommodations, considering each proposed measure with respect to the impact it would have on comparability of scores among all students, as well as on the validity of the results as a measure of student performance. Debate also centered on the purpose of accommodations, a concept originally developed to provide access to students with disabilities. The State Board inclined toward recommendations that would ease test-taking pressures for English learners, but not toward those that would fundamentally change or compromise test content or comparability of test results in a way that would lower expectations for schools to ensure English learners master California academic standards. The Board directed staff to begin developing regulations for the formal rulemaking process.

In 2003, the State Board approved regulations providing testing accommodations for English learners and thereafter formal regulations were promulgated. The regulations direct school districts to provide English learner pupils with specific testing variations if such variations are regularly used in the classroom or for assessment. (Cal. Code Regs., tit. 5, §§ 853.5, subd. (f) [CST], 1217 [high school exit exam].) These include a flexible setting and flexible schedule, translated directions, and access to translation glossaries/word lists for both tests, as well as flexible time for the high school exit exam. (Cal. Code Regs., tit. 5, §§ 853.5, subd. (f), 1217.) In addition, students can ask clarifying questions about any test directions that are presented orally in their primary language. (Cal. Code Regs., tit. 5, §§ 853.5, subd. (f), 1217.)

E. *USDE Peer Review and Audit Report*

A federal peer review of California's standards and assessments occurred in May 2006. Pursuant to that process, the USDE identified at least "two

fundamental components that warrant[ed] the designation of *Approval Pending*" for California's plan. These had to do with the need for performance descriptors that differentiate between levels of proficiency for math, English language arts and science, and concerns about the alignment of the CST with grade level academic content standards. The first issue has been resolved.

The peer review process did not highlight any deficiencies in the assessment of English language learners.[7] However, an earlier October 2005 final audit report published by the USDE Office of Inspector General made recommendations relating to the provision of accommodations, among other things. The audit indicated that the CDE should take additional steps to ensure that LEP students were provided reasonable accommodations on assessments. The audit team reviewed 2003–2004 school year data from three school districts with significant populations of migrant and LEP students. The audit found that the CDE did not report data on those students who used accommodations. However, the actual assessment data revealed that only 2 percent of LEP students used accommodations on the 2003–2004 STAR and high school exit exam assessments statewide, while the percentages for the three districts under review ranged from less than 1 percent to about 5 percent. Further, the audit report encouraged the CDE "to make every effort to complete and administer native language assessments to the extent practicable, especially in the primary languages that comprise a significant portion of the LEP population. Without native language assessments or assurance that appropriate LEP accommodations are used, assessment results may not accurately reflect LEP students' mastery of skills in subjects other than English." At the time of the audit, the State was in the process of developing a Spanish-language assessment aligned to California content standards for reading and writing, with an expected implementation of native language assessment in 2007.

### F. The Litigation

#### 1. Petition and Complaint

In June 2005, the School Districts[8] and others filed an action challenging the reliability and validity of California's testing of LEP students under the

---

[7] The School Districts assert that the peer review "found" that California "failed to demonstrate compliance with critical elements of validity of the tests and effectiveness of [English learner] accommodations." As evidence for this assertion they refer to certain peer review notes, a compilation of comments by individual reviews. The USDE's official conclusions on the results of its administrative peer review, communicated by letter to the State Board, did not incorporate or adopt any of the peer review comments concerning English learner assessments or accommodations. The status of California's standards and assessment system was designated *"Approval Pending," based solely on non-LEP testing concerns.*

[8] San Ysidro School District joined the action later.

NCLBA. The complaint alleged that respondents violated mandatory duties to create and implement a testing and accountability system for LEP students which complied with the dictates of the NCLBA. As a consequence, the School Districts suffered harm in the nature of inappropriate sanctions levied against them stemming from the faulty testing system. Further, respondents abused their discretion to the detriment of petitioners.

The School Districts also prayed for declaratory and injunctive relief, requesting a determination that the State has not complied with pertinent NCLBA provisions and the enjoining of sanctions based on the academic testing of English learners.

The prayer for relief specifically asked the trial court to compel respondents to: (1) withhold or withdraw test results of English language learners for NCLBA accountability purposes; (2) cease administering the State's current tests in English to English learners enrolled in public schools for less than three consecutive school years; (3) for testing used for NCLBA compliance, develop and administer tests in Spanish to English language learners "literate in Spanish or instructed in Spanish and English," and do the same for students literate or instructed in other languages where practicable; and (4) for all other English language learners, modify assessments to account for linguistic complexity.

### 2. *Denial of Writ Petition*

The litigation proceeded on a bifurcated basis, with phase one devoted to whether the court had legal authority to issue the requested writ. In the event the court determined it did, phase two would resolve whether the writ should issue. The trial court denied the writ petition.

The court first concluded that the State's manner of conducting student assessments for NCLBA purposes did not violate any ministerial duty created by the statute. The court reasoned that the NCLBA does not direct a specific manner or course of conduct as to how to test English language learners. Instead, it specifies the results that must ensue, i.e., valid and reliable assessments, aligned with a state's content standards, that are consistent with professional testing standards. How those results are achieved is not pronounced in the NCLBA but is left to the discretion of the states.

Turning to the question of whether California's decision to conduct its assessments in English only constituted an abuse of discretion, the court reflected that the process by which the assessments were adopted was not arbitrary or capricious, nor was it unlawful or procedurally unfair. Further, it believed that if testing in English produced negative results that did not

adequately reflect student achievement of English learners, "then the situation [would] show up as a problem. This will trigger the extensive evaluation mechanisms under the NCLB[A], including the provisions for assistance, remediation and, perhaps, sanctions." Finally, the court stated that the decision to test in English only was entitled to deference unless the exercise of that decisionmaking discretion constituted an abuse as a matter of law, which it did not. Harkening to the Proposition 227 mandate (with limited exceptions) that students lacking English proficiency be taught in English, the court ruled that the decision to assess these same students in English for purposes of NCLBA accountability was not arbitrary and capricious. And, given the range of languages extant in the student population, it was not arbitrary or capricious for the State to decide that translating and evaluating assessments in multiple languages was not practicable and therefore assessments would be in English, "the 'official' language of our educational system" as confirmed by Proposition 227 voters.

### 3. *Dismissal of Declaratory Relief Claims and of the State and Governor*

Respondents moved for judgment on the pleadings, which the court granted as to the request for a judicial declaration that their actions violated the NCLBA. The court also granted respondents' motion to dismiss the State and Governor on the basis that they were not proper parties. This appeal followed entry of judgment.

## II. DISCUSSION

### A. *Mandamus*

The School Districts maintain that California's LEP testing program violates mandatory duties under the NCLBA and constitutes an abuse of discretion. We first address the question of the availability of mandamus as a general matter, and then determine, as a matter of statutory construction, that the NCLBA commends to participating states the discretion to devise an appropriate assessment plan for LEP students. Next, we identify the quasi-legislative nature of the State Board's LEP testing decisions. From there, we address the School Districts' theory of mandamus as well as their substantive challenge to the State's LEP testing program. Finally, under the deferential standard of review accorded to the State Board's quasi-legislative actions, we confirm that the board did not abuse its discretion as a matter of law in adopting an English-only LEP testing program for NCLBA accountability purposes.

## 1. *Availability of Mandamus*

 A party may seek relief by way of ordinary or traditional mandamus "to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station . . . ." (Code Civ. Proc., § 1085, subd. (a).) Thus mandate will lie to compel the performance of a clear, present and ministerial duty on the part of the respondent where the petitioner has a beneficial right to performance of that duty. (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 868 [62 Cal.Rptr.3d 614, 161 P.3d 1168]; *City of Gilroy v. State Bd. of Equalization* (1989) 212 Cal.App.3d 589, 607 [260 Cal.Rptr. 723].) A ministerial act is one that a public functionary " ' "is required to perform in a prescribed manner in obedience to the mandate of legal authority," ' " without regard to his or her own judgment or opinion concerning the propriety of such act. (*Ridgecrest Charter School v. Sierra Sands Unified School Dist.* (2005) 130 Cal.App.4th 986, 1002 [30 Cal.Rptr.3d 648].) And, while a party may not invoke the remedy to force a public entity to exercise discretionary powers in any particular manner, if the entity refuses to act, mandate is available to compel the exercise of those discretionary powers in some way. (*Sego v. Santa Monica Rent Control Bd.* (1997) 57 Cal.App.4th 250, 255 [67 Cal.Rptr.2d 68].) Finally, mandamus may also issue to correct the exercise of discretionary legislative power, but only where the action amounts to an abuse of discretion as a matter of law because it is so palpably unreasonable and arbitrary. (*Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1264–1265 [4 Cal.Rptr.3d 536] (*Carrancho*).)

## 2. *The Discretionary Nature of the State's Duties Under the NCLBA*

 Discerning the nature of the State's duties under the NCLBA is a matter of statutory construction. We construe federal statutes in line with the pertinent rules enunciated by the United States Supreme Court. (*RCJ Medical Services, Inc. v. Bonta´* (2001) 91 Cal.App.4th 986, 1006 [111 Cal.Rptr.2d 223].) The high court has explained: "The starting point for interpretation of a statute 'is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.' [Citation.]" (*Kaiser Aluminum & Chemical Corp. v. Bonjorno* (1990) 494 U.S. 827, 835 [108 L.Ed.2d 842, 110 S.Ct. 1570].) Further, " 'In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' [Citations.]" (*Philbrook v. Glodgett* (1975) 421 U.S. 707, 713 [44 L.Ed.2d 525, 95 S.Ct. 1893].)

 With these principles in mind, we examine the various provisions pertaining to student assessments. States receiving funds under the NCLBA

must adopt and implement yearly assessments in core academic areas that provide for inclusion of LEP students. (20 U.S.C. § 6311(b)(3)(C)(ix)(III).) Inclusion is not the issue here; California includes LEP students in its assessment program.

The NCLBA additionally charges that assessments "be consistent with widely accepted professional testing standards [and], objectively measure academic achievement, knowledge, and skills . . . ." (20 U.S.C. § 6311(b)(3)(C)(xiv).) Likewise, states must assess their LEP students "in a valid and reliable manner" and provide "reasonable accommodations . . . including, to the extent practicable, assessments in the language and form most likely to yield accurate data on what such students know and can do in academic content areas." (*Id.*, § 6311(b)(3)(C)(ix)(III); see 34 C.F.R. § 200.6(b)(1) (2009).)[9]

The above provisions announce the attributes that must inform a participating state's assessment of its LEP students. The tests must be "reliable" and "valid"; reasonable accommodations must be provided; and to the "extent practicable" these accommodations should include "assessments in the language and form most likely to yield accurate data." In simple terms, a valid test is one that in fact measures what it is supposed to measure, whereas a reliable test is one that produces consistent test scores over time: "Validity refers to the degree to which evidence and theory support the interpretations of test scores entailed by proposed uses of tests. . . . It is the interpretations of test scores required by proposed [test] uses that are evaluated, not the test itself." (Am. Educational Research Assn., Am. Psychological Assn., Nat. Council on Measurement in Education, Standards for Educational and Psychological Testing (1999) p. 9.) "Reliability data ultimately bear on the repeatability of the behavior elicited by the test and the consistency of the resultant scores. The data also bear on the consistency of classifications of individuals derived from the scores." (*Id.* at p. 31.)

■ Notwithstanding the statutory requisites of validity and reliability, the NCLBA expressly proscribes the Secretary from dictating any particular assessment instrument or mode of instruction (20 U.S.C. § 6311(b)(6), (e)(1)(F)), and nowhere obligates a state to test LEP students in their primary language. (See *Reading School Dist. v. Department of Educ.* (Pa.Commw.Ct. 2004) 855 A.2d 166, 172 [native language testing not mandatory, but should

---

[9] Specifically, the regulations provide that states "must assess [LEP] students in a valid and reliable manner that includes—[¶] (A) Reasonable accommodations; and [¶] (B) To the extent practicable, assessments in the language and form most likely to yield accurate and reliable information on what those students know and can do to determine the students' mastery of skills in subjects other than English until the students have achieved English language proficiency." (34 C.F.R. § 200.6(b)(1)(A), (B) (2009).)

be provided to extent practicable for a state to do so].) Instead, it requires only that a state provide "reasonable accommodations" that include, if practicable, alternative assessments "in the language and form most likely to yield accurate data." (20 U.S.C. § 6311(b)(3)(C)(ix)(III).) Whether the particular "language and form" of an assessment is likely to yield accurate results of course depends on the particular student population being tested, and the mode of instruction they are receiving, among other factors. This open-ended approach to accommodations, and the explicit concern for "practicability" and reasonableness, are all statutory signposts calling for broad discretion. In sum, the NCLBA invites each state to make its own judgment call in fashioning a testing program for its LEP students, consistent with the attributes enumerated in 20 United States Code section 6311(b)(3)(C)(ix)(III).

Our conclusion that the NCLBA entrusts it to the discretion of participating states to devise an appropriate assessment plan for LEP students is bolstered by USDE missives on the topic. In 2004, the USDE, as the federal agency entrusted with administering the NCLBA, issued communications attesting that states are not required to develop assessments in native languages, and that in a given state such assessments likely would not cover the gamut of all languages spoken in public schools. Additionally, the department reiterated that states have wide flexibility in determining how best to test their LEP students, and can offer a menu of accommodations. One press release/fact sheet ended with this summary: "To summarize, states decide how best to test LEP students [and] which accommodations to use . . . ." While these press releases and fact sheets are not formal regulations constituting binding interpretations of the NCLBA, we can properly resort to them for guidance, in light of the fact that the USDE and its staff have accumulated "a substantial 'body of experience and informed judgment.' " (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 14 [78 Cal.Rptr.2d 1, 960 P.2d 1031], quoting *Skidmore v. Swift & Co.* (1944) 323 U.S. 134, 140 [89 L.Ed. 124, 65 S.Ct. 161].)

### 3. *The Nature of the State's LEP Testing Decisions*

In the case of California, the considerable discretion afforded to states under the NCLBA is exercised through the State Board, a constitutionally derived body comprised of 10 persons appointed by the Governor. (Cal. Const., art. IX, § 7; Ed. Code, § 33000.) Our Legislature has specifically designated the State Board as "the governing and policy determining body" of the CDE. (Ed. Code, § 33301, subd. (a).) In keeping with this delegation of legislative power, the Education Code provides that "[t]he board shall determine all questions of policy within its powers" (*id.*, § 33030), and "shall adopt rules and regulations not inconsistent with the laws of this state" for the government of K-12 schools (*id.*, § 33031). By virtue of this delegated

policymaking authority, the Legislature intended the State Board "to establish goals affecting public education in California, principles to guide the operations of the Department, and approaches for achieving the stated goals." (*State Bd. of Education v. Honig* (1993) 13 Cal.App.4th 720, 766 [16 Cal.Rptr.2d 727].)

When the State Board exercises its delegated policymaking authority, it performs a quasi-legislative function under California law. (See *Carrancho, supra,* 111 Cal.App.4th at p. 1266.) Quasi-legislative actions—those undertaken by an agency in its legislative capacity—entail "the formulation of a rule to be applied to all future cases . . . ." (*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 35, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29]; see *McGill v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1785 [52 Cal.Rptr.2d 466].) This is exactly what the State Board did. Proceeding in public, the body engaged in a deliberative policymaking process to determine how LEP students would be tested in future years for purposes of the NCLBA and state testing imperatives.

### 4. School Districts' Theory of Mandamus

The School Districts do not dispute that the NCLBA leaves it to the participating states to exercise discretion in determining *how* to assess LEP students in a way that accomplishes the statutory purposes and dictates. However, their theory of the case undermines this basic dynamic. The School Districts' theory is this: The NCLBA imposes on participating states mandatory duties to assess LEP students in a valid and reliable manner and provide reasonable accommodations most likely to yield accurate data. Because these duties are mandatory, a state's function in carrying them out becomes ministerial, notwithstanding the exercise of discretion as to how to fulfill the mandate. Continuing, they argue that the assessment program adopted by the State Board for testing LEP students under the NCLBA has not been shown to validly measure the academic achievement of these students, and thus California has failed to fulfill its mandatory ministerial duties under federal law. Therefore, the trial court should have issued a writ of mandate ordering the State to "come back with a valid system for measuring what English learners know academically."

This approach conflates the constraints the NCLBA imposes on the margins of agency discretion with the notion of ministerial duties; in the process it eliminates the distinction between ministerial and discretionary acts, and at the same time ignores the quasi-legislative nature of the State Board's action which is the target of this lawsuit. The impact of this approach is not inconsequential because our standard of review varies depending on the nature of the agency's actions. " 'The appropriate degree of judicial scrutiny

in any particular case is perhaps not susceptible of precise formulation, but lies somewhere along a continuum with nonreviewability at one end and independent judgment at the other.' [Citation.] Quasi-legislative administrative decisions are properly placed at that point of the continuum at which judicial review is more deferential; ministerial and informal actions do not merit such deference, and therefore lie toward the opposite end of the continuum." (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 575–576 [38 Cal.Rptr.2d 139, 888 P.2d 1268].)

The School Districts are seeking independent review of the State Board's testing policy for English learners. They have urged there must be a trial, with a battle of experts and the like. And at the end of the day they envision that the trial court would independently evaluate and review the evidence to determine whether the testing regime adopted by the State Board met the statutory requirements of validity, reliability and the provision of appropriate accommodations.

What is wrong with this picture? Rather than assuming the role of deferential reviewer of the agency's actions, the court would become the official second-guesser on the issue of how to assess LEP students under the NCLBA, tasked with the job of figuring out whether the tests are valid and reliable, etc. The NCLBA confers discretion on the participating states to do this very thing and here the State Board, exercising its quasi-legislative powers, undertook to do this job. The School Districts' position impinges on the separation of powers, impermissibly injecting the judiciary into the quasi-legislative functions lodged with the State Board.

*Carrancho* is instructive. There, rice grower plaintiffs petitioned for a writ of mandate on allegations that a diversion plan and progress report prepared by responsible state agencies and required by the Legislature failed to comply with the enabling statute. They lost. On appeal, the growers asserted that the trial court should have exercised its independent judgment in reviewing the plan and report. Concluding that the actions of the responsible agencies in preparing the plan and report were quasi-legislative in nature, the *Carrancho* court undertook a deferential review to determine whether these actions were arbitrary or capricious. (*Carrancho, supra*, 111 Cal.App.4th at pp. 1259, 1265–1267, 1272–1274, 1278–1279.) Significantly, in distinguishing between questions of statutory interpretation eliciting de novo review, and those asking a court to pass on an agency's effort to effect a statutory purpose, the *Carrancho* court had this to say: "A court passing on the means employed by an agency to effectuate a statutory purpose will not substitute its judgment for that of the agency in the absence of arbitrary and capricious action." (*Id.* at p. 1272, citing *Ralphs Grocery Co. v. Reimel* (1968) 69 Cal.2d 172, 179 [70 Cal.Rptr. 407, 444 P.2d 79].) This litigation is all about asking the court to

pass on the means employed by the State Board to effect the statutory purpose of 20 United States Code section 6311(b)(3)(C)(ix)(III). And, in undertaking this role, we are governed by the rules illuminating the abuse of discretion standard for review of quasi-legislative agency actions.

5. *School Districts' Substantive Challenge to the State's LEP Testing Program*

■ The School Districts' challenge to California's LEP testing regime centers on the purpose and use of the tests for NCLBA accountability purposes. Under the act, all assessments shall "be used for purposes for which such assessments are valid and reliable . . . ." (20 U.S.C. § 6311(b)(3)(C)(iii).) LEP students must be tested, to the extent practicable, in the language and form most likely to yield accurate and reliable information on what they know and can do in the core academic content areas. (*Id.*, § 6311(b)(3)(C)(ix)(III); 34 C.F.R. § 200.6(b)(1)(B) (2009).) Thus testing validity is tied to the testing purpose, which is to measure LEP students' proficiency in mastering the core academic content standards. These standards, in turn, are the "challenging academic content standards" adopted by the participating states in the core content areas specified by the act. (20 U.S.C. § 6311(b)(1)(A).) To satisfy the statutory requirements, and after due consideration, the State Board adopted an assessment program that calls for testing LEP students in English.

The School Districts denounce this testing decision as being grounded in an improper purpose, namely to measure what LEP students know and can do in the academic content areas *in English*. This purpose, they maintain, is incompatible on its face with the NCLBA and thus "inherently invalid."

■ We disagree. Reading the statutory scheme as a whole, we cannot conclude that Congress intended to foreclose a state's discretionary decision that testing LEP students in English with accommodations is the most propitious method of satisfying the statutory mandates. The NCLBA specifies that *all* students must be tested for grade level proficiency *on the same state academic content standards*. The purpose of the CST and high school exit exam, within the framework of NCLBA accountability, is to assess *all* California public school students, LEP's and non-LEP's alike, in English, on the same reading/language arts and math grade level academic standards. Thus all California students are called upon to demonstrate their content knowledge in English.

The NCLBA permits, but does not require, primary language testing and does not mandate that tests measure academic content *independent of* language. Indeed, the law contemplates that LEP students would either be tested

in English with accommodations or in their primary language. That is to say, the NCLBA does not say that LEP students must be tested "in a valid and reliable manner" *in their primary language*. Nor does it say that they must be tested in English, except that written reading and language arts tests must be administered in English after a student has attended school in this country for three years, subject to local discretion to prolong primary language testing for an additional two years. Rather, as we have explained, it is the state's prerogative under the NCLBA to adopt a testing scheme that is valid and reliable for LEP's. Some states, including Arizona, have made the decision to test LEP students only in English. Arizona's assessment program has received full USDE approval with a strong recommendation that the state consider expanding the range of accommodations available to these students. On the other hand, some states which have opted for primary language tests have encountered obstacles to USDE approval based in part on concerns of test comparability.

The Secretary has provided further insight into this issue. In September 2006, the Secretary issued final regulations regarding LEP students. (34 C.F.R. § 200.6 (2009); 71 Fed.Reg. 54188 (Sept. 13, 2006).) Responding to a comment on the proposed regulations that Spanish native language assessments should always be defined as "practicable" and requesting clarification of the states' responsibilities to develop and administer native language assessments, the Secretary stated: "Although Spanish is the most common of the hundreds of different languages spoken by LEP students, Spanish native language assessments are not always practicable, nor do they always result in accurate and reliable information on what students know and can do. For example, a native language assessment may not yield valid and reliable results for students who are not literate in their native language, who speak a dialect that is different from the one in which the native language assessment is written, *or who receive the majority of their instruction in English and thus have not been exposed to the academic vocabulary of their native language.*" (71 Fed.Reg. 54188, 54190 (Sept. 13, 2006), italics added.) The Secretary's response recognizes that LEP student populations and modes of instruction differ, and thus these factors affect a state's choice to proceed with primary language assessments or assessments in English with accommodations.

■ Finally, the USDE's decision to assign California's standards and assessment system the status of *"Approval Pending"* following its administrative peer review—*based on technical issues entirely unrelated to LEP testing*—is entitled to some deference on the matter of the validity of California's LEP testing purpose and protocol. Under the NCLBA, it is a state's duty to submit a plan with the statutory components. But it is the Secretary's responsibility, with the assistance of the peer review process, to determine whether a state's plan or component thereof meets the statutory requisites. (20 U.S.C. § 6311(e).) This litigation does not directly confront,

nor to our knowledge have the School Districts independently resorted to the Administrative Procedure Act[10] in an attempt to assail, the USDE's initial approval of California's plan or the *"Approval Pending"* designation issued more recently with respect to our standards and assessment system.

The deference accorded federal agency action entitles an approved plan to a presumption of regularity, but does not foreclose probing judicial review. (*Homes for Aging Assn. v. Medicaid Policy & Planning* (7th Cir. 1995) 60 F.3d 262, 266 [Medicaid plan].) Agency action will be upheld and is entitled to deference if it is not arbitrary, capricious, an abuse of discretion or in conflict with governing law. (*Concourse Rehabilitation & Nursing Ctr. v. DeBuono* (1999) 179 F.3d 38, 44; *Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 825–826 [135 Cal.Rptr.2d 1, 69 P.3d 927]; *RCJ Medical Services, Inc. v. Bonta´, supra,* 91 Cal.App.4th 986, 1010 [all cited cases involve state Medicaid plans].) In *Olszewski,* our Supreme Court ruled that federal approval of California's Medicaid plan did not equate with ratification of the state lien provider provisions at issue. However, the record there did not indicate federal approval of those particular statutes or that they had even been submitted for approval. Unlike *Olszewski,* here the State's assessments, standards and accountability system were subject to extensive administrative review and the Secretary has passed on those very components of California's plan. To our knowledge, no challenge to that decision has been pursued.

■ For all these reasons, we conclude that a purpose to measure LEP students' mastery of academic content standards in English is not incompatible with the NCLBA. And, as detailed below, the State Board did not abuse its discretion in deciding to test LEP students in English, with accommodations.

### 6. *No Abuse of Discretion*

a. <u>Standard of Review</u>: In deciding whether an agency's policy decision amounts to an abuse of discretion that warrants correction by judicial intervention, we are guided by the well-formulated standard set forth in *Pitts v. Perluss* (1962) 58 Cal.2d 824, 834–835 [27 Cal.Rptr. 19, 377 P.2d 83], involving review of certain risk selection regulations adopted by the Director of the Department of Employment: "[I]n determining whether the director has acted arbitrarily or capriciously, this court does not inquire whether, if it had power to draft the regulation, it would have adopted some method or formula other than that promulgated by the director. The court does not substitute its judgment for that of the administrative body. The rendition of this regulation involved 'highly technical matters requiring the assistance. of skilled and

---

[10] Title 5 United States Code section 701 et seq.

trained experts and economists and the gathering and study of large amounts of statistical data and information.' [Citation.] Under such circumstances, 'courts should let administrative boards and officers work out their problems with as little judicial interference as possible.' [Citation.] The substitution of the judgment of a court for that of the administrator in quasi-legislative matters would effectuate neither the legislative mandate nor sound social policy." (Fn. omitted.)

Under this standard of review, we also probe whether the agency's decision was " 'entirely lacking in evidentiary support, or unlawfully or procedurally unfair.' " (*Carrancho, supra,* 111 Cal.App.4th at p. 1265.) Further, we must ensure that the agency adequately considered all relevant factors, and demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling legislation. (*Ibid.*) Finally, a petitioner seeking review of quasi-legislative actions under Code of Civil Procedure section 1085 bears a heavy burden of showing that the decision is " ' "unreasonable or invalid as a matter of law." ' " (*Wirth v. State of California* (2006) 142 Cal.App.4th 131, 138 [47 Cal.Rptr.3d 623].)

Whether the agency's policy decision is tainted by one or more of the above factors is a question of law. We perform the same function as the trial court, and thus its determinations are not conclusive on appeal. (*Personnel Com. v. Board of Education* (1990) 223 Cal.App.3d 1463, 1466 [273 Cal.Rptr. 288].) We conclude that the State Board's policy decision to test LEP students in English under regulations adopting testing accommodations for these students did not, as a matter of law, constitute an abuse of its discretionary, quasi-legislative authority.

■ b. Analysis: First, we agree with the trial court that *how* California's method of assessment came to be included in the State's plan under the NCLBA was not unlawful or otherwise procedurally unfair. The State's plan, which includes the assessment program, must be prepared in consultation. with local educational agencies, teachers, principals, pupil services personnel, administrators, other staff and parents. (20 U.S.C. § 6311(a)(1).) The USDE reviews the plan with the assistance of a peer review process, again involving representatives of the spectrum of education stakeholders who are familiar with the pertinent educational issues and challenges. (*Id.,* § 6311(e)(1)(B).) California's plan was accepted and, seeing no evidence to the contrary, we presume that the proper procedures and consultations took place.

Second, the State Board's substantive decision did not amount to an abuse of discretion as a matter of law. To begin with, the State Board worked with ETS on the test development process. ETS test developers were guided by principles of "universal design" to minimize unnecessary linguistic complexity and bias on the exams, reduce excessive wordiness and sentence lengths,

etc., all to the ends of reducing threats to validity that might arise from language differences, and otherwise decreasing avoidable disadvantage to LEP students.

Third, the Expert Panel convened to advise the State Board on testing policies for English learners reckoned with significant policies and operational concerns, including Proposition 227 and its imperative to promote rapid development of English for these students. It recommended against testing in primary languages for several reasons. Given the Proposition 227 decree and its implementation in the classroom, testing in primary languages could send confusing messages throughout California's education system. Additionally, because the proficiency of students in their primary language varies widely and more than 90 percent of English learners are taught in English, the panel concluded testing in primary languages would not improve the accuracy of state test results. The multiplicity of languages spoken in California public schools presented other feasibility concerns and while most English learners speak Spanish, the panel was of a mind that it would not be appropriate to include some languages and exclude others. The panel also rejected a dual system using translated tests based on significant concerns about the validity and comparability of test results. As well, the panel recognized that English language arts skills—one of the content areas tested under the NCLBA—*could not* be measured in a language other than English. On the matter of accommodations, the panel advised the State Board to consider the impact of each proposed accommodation in terms of whether it could improve testing conditions for English learners and be implemented consistently, while also providing valid, accurate and useful results.

These issues were reported and presented to the State Board and considered as an agenda item at an open meeting. Subsequent deliberations on accommodations vetted their impacts and purpose. Throughout this process, State Board members reasonably could derive some assurance from the fact that the Secretary had approved California's plan and its English-only testing approach. In the end the State Board did not opt for primary language testing for statewide NCLBA accountability purposes, but instead committed to develop regulations authorizing testing accommodations for English learners.

We have carefully reviewed the record of the proceedings resulting in these policy decisions and cannot cast these decisions as arbitrary, capricious, or lacking in evidentiary support. With the choice of the State's testing contractor, ETS, the State Board addressed the need to avoid unnecessary linguistic complexity and bias in the CST and high school exit exam. The State actors also took stock of State policy as well as issues of comparability and validity; the reality that English learners exhibited wide variations in academic skills in their native language; the administrative feasibility of primary language

testing; the impact of primary language testing on the accuracy of test results; and the impact of accommodations on comparability of test results. These were appropriate factors to consider in light of the NCLBA directives to (1) test all students on the same grade level academic content standards, and (2) test LEP students "in a valid and reliable manner" with provision of reasonable accommodations, "including, to the extent practicable, assessments in the language and form most likely to yield accurate data on what such students know and can do in academic content areas . . . ." (20 U.S.C. § 6311(b)(3)(C)(ix)(III).)

Because reasonable minds could differ as to the wisdom of the State Board's policy decisions, we will not ask whether some other policy is preferable, or otherwise intervene to supplant the State Board's judgment with our own views. (*Manjares v. Newton* (1966) 64 Cal.2d 365, 370–371 [49 Cal.Rptr. 805, 411 P.2d 901]; *Pitts v. Perluss, supra*, 58 Cal.2d at pp. 834–835.) Trained and experienced experts met over a two-day period to come up with meaningful recommendations for a comprehensive and consistent policy for inclusion of all limited English students in California's assessment program. The State Board was fully informed of these deliberations, engaged in its own discourse and made its decision. On this record the substitution of our judgment for that of the State Board would be misguided.

The School Districts are unrelenting in their criticism that the State Board's decisions were improperly driven and limited by the educational policy proclaimed in Proposition 227.

■ First, it is clear that the NCLBA does not aim to displace state educational policy. As an illustration, we noted above that the Secretary fully approved with recommendations Arizona's assessment and accountability system, in which LEP students are tested in English consistent with state law and policy. (See pt. II.A.5., *ante.*) Specifically, the Secretary noted that Arizona's "assessments, with appropriate accommodations, provide a valid means for assessing the academic proficiency of English language learners. . . . [The recommended expanded range of] accommodations [is] *not in conflict with Arizona's English-only statutes* . . . ." (Henry L. Johnson, U.S. Dept. of Educ., Ariz. Assessment Letter to Ariz. Superintendent of Pub. Instruction Tom Horne, June 30, 2006, italics added.) As we read the law, the NCLBA *accommodates* state policies as long as a state plan and its components come within the confines of the NCLBA assessment and accountability framework. And in keeping with the nature of the federal-state relationship under the NCLBA, the Secretary cannot order a state to use a specific assessment or mode of instruction.

■ Second, California's *policy* to promote rapid development of English for English learners *directly impacts instruction* of English learners in this

State. Proposition 227 requires that all children be placed in English language classrooms,[11] subject to a parental waiver.[12] (Ed. Code, §§ 305, 310.) As a temporary transition normally not exceeding one year, English learners are to be educated through sheltered English immersion.[13] (Ed. Code, § 305.) Thus Proposition 227 contemplates that even during the first year or so of transition, students are receiving most of their instruction in English. According to the Expert Panel, approximately 90 percent of English learners are now instructed in English. Further, test scores of English learners in their first year of school in this country—presumably when they are in sheltered English immersion—*are not funneled* into the NCLBA calculations. Moreover, in California we are talking about a window of only two consecutive years in which there would be a possibility that an English learner could be tested in reading/language arts in their native language for NCLBA accountability purposes. (20 U.S.C. § 6311(b)(3)(C)(x).) Thus, the decision to test all English learners in English *with provisions for accommodations*[14] serves the assessment requirements of the NCLBA in light of the reality that under our state policy, almost all English learners are taught in English. To teach in English but test in another language could create confusion and compromise test results. And, as noted previously, the Secretary has recognized that primary language assessment may not yield valid and reliable results for

---

[11] An " 'English language classroom' " is one in which "the language of instruction used by the teaching personnel is overwhelmingly the English language, and in which such teaching personnel possess a good knowledge of the English language." (Ed. Code, § 306, subd. (b).)

[12] Parental waivers may be granted in the following circumstances: (1) the child already knows English; (2) the child is 10 years or older and the principal and school staff believe an alternate course of study would better suit the child's rapid acquisition of English language skills; or (3) the child has special needs. (Ed. Code, § 311.)

[13] " 'Sheltered English immersion' " refers to "an English language acquisition process for young children in which nearly all classroom instruction is in English but with the curriculum and presentation designed for children who are learning the language." (Ed. Code, § 306, subd. (d).)

[14] The School Districts fault the regulations adopting accommodations as promulgated by the State Board, as well as implementation of the accommodations. They also tendered expert declarations to the effect that glossaries and translated dictionaries were not standardized for application on a statewide basis; school districts choosing to employ these accommodations must create the glossaries themselves and do the translations; and little research was available on their effectiveness. As we related above, the State Board considered appropriate factors in proposing the accommodations. Further, under the regulations, local school districts determine whether English learners have access to accommodations. This makes common sense since districts do not have cookie-cutter English learner populations, and students' needs vary. The audit report mentioned above pointed out that reporting on the use of accommodations as well as provision of accommodations were problematic. (See pt. I.E., *ante.*) The School Districts' deponents in this litigation have reported that the use of accommodations varies by school and classroom; however, notably, some have indicated that they are beginning to use Spanish-English glossaries, or plan on offering them. Thus it is likely that use of accommodations will increase. In any event, the actual implementation of testing accommodations—as opposed to their content and the policy decision to proceed under a plan of accommodations rather than primary language testing—is not before this court.

students instructed mainly in English who thus lack exposure to academic vocabulary in their primary language. (71 Fed.Reg. 54188, 54190 (Sept. 13, 2006).)

The School Districts also argue that in determining that the State Board properly exercised its discretion, the trial court improperly declined to consider or rely on any evidence relating to the validity and reliability of the testing system or the effectiveness of accommodations. To reiterate, we do not don the hat of official second-guesser or otherwise exercise our independent judgment in reviewing the State Board's policy decisions on how to test English learners. (*Carrancho, supra*, 111 Cal.App.4th at p. 1272.)

■ However, we *are* disturbed that the trial court struck all admitted exhibits from the record. Fortunately, we have a complete record of what was before the trial court prior to that deed, which we have perused as appropriate. Since we do not defer to the trial court's decision and undertake our own review *applying the same standard to* ascertain *whether the State Board* abused its discretion as a matter of law, no prejudice stems from this omission. Moreover, we are mindful that in reviewing quasi-legislative administrative decisions in traditional mandamus proceedings, extra-record evidence amounting to nothing more than contradictory expert testimony designed to question the wisdom and accuracy of an agency's decision generally is not admissible. This is because the issue would tend to become whether the decision was wise in light of such evidence, not whether it was a prejudicial abuse of discretion. (*Western States Petroleum Assn. v. Superior Court, supra*, 9 Cal.4th 559, 576–578.)

## B. *Declaratory Relief*

In their declaratory relief count, the School Districts pursued a declaration that respondents' actions violated the NCLBA, based on the same underlying facts alleged in support of the writ petition. They maintain the trial court should not have dismissed this claim, insisting that resolution of the mandamus petition has no bearing on the appropriateness of declaratory relief. We disagree.

■ As between the School Districts and respondents, the trial court had before it one lawsuit seeking different remedies on the issue of testing English learners under the NCLBA. On this issue, the complaint did not state separate causes of action; rather, it asked for different forms of relief. In framing the existence of a cause of action, California subscribes to the

primary rights theory. Thus, the invasion of one primary right gives rise to but a single cause of action. (*R & A Vending Services, Inc. v. City of Los Angeles* (1985) 172 Cal.App.3d 1188, 1193–1194 [218 Cal.Rptr. 667].) Moreover, our Supreme Court has cautioned that the declaratory judgment procedure cannot "be interpreted so as to extend the jurisdiction of the courts or broaden the liability which may be imposed upon governmental bodies . . . ." (*Hoyt v. Board of Civil Service Commrs.* (1942) 21 Cal.2d 399, 404 [132 P.2d 804].)

Here, the School Districts alleged violations of the assessment requirements for English learners under the NCLBA, and harm emanating to them and others due to sanctions imposed under the purportedly defective testing system. With our decision today affirming that the State Board did not abuse its discretion in adopting the assessment program that it did, the School Districts have no cause of action against respondents and therefore no remedy for mandamus. Because the declaratory relief claim derives solely from the allegations of the mandate claim, the finality of judgment in this appeal will end the matter for the School Districts.

### C. *Additional Parties*

Finally, the School Districts assault the trial court's dismissal of the State and Governor as proper parties. According to the School Districts, should we determine that the trial court erred in denying their petition for writ of mandate, the State and Governor become proper parties because of their potential role in effecting legislation necessary for relief. Our decision today moots this claim.

## III. DISPOSITION

The judgment is affirmed.

Ruvolo, P. J., concurred.

**RIVERA, J.,** Concurring.—I concur in the judgment but disagree with a small portion of the majority's analysis. Part II.A.4. of the majority opinion describes the appellant school districts' theory of mandamus as improperly seeking independent judicial review of the State Board of Education's (State Board) discretionary, quasi-legislative actions in implementing the No Child

Left Behind Act (NCLBA). This case is, according to the majority, "all about asking the court to pass on the means employed by the State Board to effect the . . . purpose of [the statute]" and therefore neither mandamus nor independent review is available. (Maj. opn., *ante*, at pp. 117–118.) This is not how I read the school districts' theory of mandamus. In my view, the majority has conflated two of the districts' arguments into a single theory.[1]

The school districts' threshold argument in this litigation is whether the State Board's implementation of a statute within the NCLBA was in conflict with the fundamental purpose of the statute—a question that, in the first instance, calls for statutory interpretation. As we state in the introduction, "the School Districts' premise [is] that the purpose of California's LEP [limited English proficient] testing regime is at odds and incompatible on its face with the NCLBA . . . ." (Maj. opn., *ante*, at p. 101.) And, we address this very contention in part II.A.5. of our opinion where we state: "The School Districts denounce [the State Board's LEP] testing decision as being grounded in an improper purpose, namely to measure what LEP students know and can do in the academic content areas *in English*. This purpose, they maintain, is incompatible on its face with the NCLBA and thus 'inherently invalid.' " (Maj. opn., *ante*, at p. 118.) We then analyze and reject this theory, concluding that "a purpose to measure LEP students' mastery of academic content standards in English *is not incompatible with the NCLBA*." (Maj. opn., *ante*, at p. 120, italics added.)

Had we construed the NCLBA as requiring testing for English learners to be valid independent of their English fluency wherever feasible, declaratory relief or a writ of mandate might well have been in order. (See, e.g., *Morris v. Williams* (1967) 67 Cal.2d 733, 737 [63 Cal.Rptr. 689, 433 P.2d 697] [agency actions that fail to carry out the purpose of the authorizing statute "are void and no protestations that they are merely an exercise of administrative discretion can sanctify them."]; *Alford v. County of San Diego* (2007) 151 Cal.App.4th 16, 23, 34 [59 Cal.Rptr.3d 596] [writ issued; agency regulations adopted to implement, interpret or carry out a statute's provisions must be consistent with the statute; standards that fail to carry out the statute's objectives are void].) In the end, we decided the State Board's tests were not in conflict with the law, based upon our interpretation of the relevant statutes

---

[1] I join my colleagues in rejecting the school districts' attempt to use expert evidence to prove that the State Board's actions did not satisfy legal requirements "as a matter of fact." (Maj. opn., *ante*, at p. 117.) As we note, it is inappropriate in a mandamus action to introduce evidence outside of the record comprised of "contradictory expert testimony designed to question the wisdom and accuracy of an agency's decision." (Maj. opn., *ante*, at p. 125.) But this argument was distinct from the districts' threshold contention that the tests were invalid "as a matter of law," relying on the statutory language.

and upon other evidence in the record supporting that interpretation. (Maj. opn., *ante*, at pp. 118–120.) We also determined that the State Board's actions in carrying out the NCLBA were not an abuse of discretion. (Maj. opn., *ante*, at 120–125.) These determinations answer all of the issues raised in this litigation. Part II.A.4. of the majority opinion is unnecessary and is based on the mistaken premise that mandate was categorically unavailable under any of the school districts' theories.

A petition for a rehearing was denied August 20, 2009.